Good morning everyone. First case this morning is number 07-1530. Before I introduce the case, let me interrupt myself to introduce Judge Zobell, District Court of Massachusetts, who is sitting with us by designation. Back to case number 07-1530, Johns Hopkins v. Datascope. Mr. Wepner. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Roy Wepner for Appellant, Datascope. By way of an overview, this is a patent infringement case in which the plaintiffs served their initial timely expert report relating with infringement, which in our view said essentially nothing in terms of explaining how the expert reached his conclusions as to why there was infringement. In full effect, the expert checked the boxes on the claim chart. Did the trial judge give you leave to take time to examine the expert after the late report, before the trial continued? No, not before the trial continued. The judge said he would give me extra time if I wanted, but he was not offering to stop the trial. The trial was going to continue. All he was offering to do was to say, I'll give you more time, you can cross-examine him at a later point in the trial. You're talking about the amended report that was filed that you received the day before, but how about the initial report? The initial report, as we've explained, Your Honor, in our view, it basically said nothing as to how the use of the accused product met the contested limitations of the claim. And how far in advance of the start of the trial was that? A substantial amount of time, Your Honor. Did you depose the expert? No, we chose not to, Your Honor. Then how can you complain if you chose not to depose the expert? Because we had no need to depose him because we believed his report was deficient and that he should not be permitted to testify based on a report of that nature. We felt that it was not our job to pull teeth from an expert and find out what his theories are. And in any event, the new theory we didn't get until the night before he testified, and the pretext of that was that it was based on the court's claim construction, which occurred, I believe, 17 days before the trial. So having taken his deposition, it's almost inconceivable that we would have found out what his final theory would have been anyway. I'm sorry. Well, I was really going to pursue the same point, that the trial judge did then say that you could have additional time. He declined to delay the trial. That's correct. He did not give me an opportunity to engage a rebuttal expert. He did not say I could depose the expert on his new report. He just simply said that while the trial continues, he would defer the cross-examination of the expert. That was all he offered to do. And we were told that the expert had to leave within one day, and so in essence we had 24 hours with three or four other witnesses testifying at the trial while this was going on. So had you had more time, what difference would it have made? Well, that was why we didn't really ask. We felt that having now seen what his testimony was, we felt our best shot was to try to neutralize him as best we could on cross-examination, and we believe, in fact, we did, as I would like to explain. If I can move on to that issue. I'm really trying to understand whether you're telling us that things were so seriously unfair that everything should be wiped out. They were that unfair, and it was sandbagging, unless this court concludes that we successfully demonstrated that there was no infringement on the cross that we had basically an hour to prepare for. I believe we did. I believe we succeeded in doing that, as I would like to go into, but it was the worst kind of sandbagging to get an expert report literally sometime around 11 p.m. on the night before he testified, which was the first time he explained this entire theory that became the focus of his direct testimony. We should have had that days, weeks, if not months earlier. It's just simply not enough in a patent infringement case having some complexity to expect counsel in the middle of trial to try to digest a brand-new expert report and simply go ahead even with a couple extra hours to prepare. That was simply too little, too late. That's our position, Your Honors. May I move on? On the issue of infringement itself, all the claims in all three patents were directed to methods, and each independent claim of the 191 and 551 patents, which together accounted for 94 percent of the damage claim, included a step of introducing a fragmentation catheter, which comprises a fragmentation member. The 191 patent also recited a step of deploying the fragmentation member, and the two patents also required rotating the fragmentation member. Now, the district court construed fragmentation member as a means plus function element under 112 paragraph 6, and he concluded that the structure was a wire basket or cage. That claim construction has not been appealed by the other side in this case. And you don't complain about it either? Not at all. Not at all. You got exactly what you wanted. Yes, we did. We did, Your Honor. And the specification makes clear that the wire basket in the embodiments shown in the specification have three to six wires. Now, it's our contention that the plaintiffs offered no evidence comparing the physical structure of the accused basket with the physical structure of the wire basket in the specification, which everyone agreed was a single S-shaped wire as contrasted with a basket made of three to six wires. Now, the only possible source of evidence came from this expert we've talked about, Dr. Valje. He admitted, as he had to, that the S-shaped wire is obviously not a basket. And then he conceded that it only becomes a wire basket or the equivalent when it is rotated. The problem is that the claim requires that it be a wire basket at all times, that it have the structure that's equivalent to a wire basket. Let me ask you, as I understand, and please jump on me if I've got a case long enough, but as I understand, say, like, I guess, in Odetics and Applied Medical, we said that when you're determining whether an accused device is a 112 paragraph 6 equivalent, we look to how it functions to achieve the... how it operates to achieve the result that's required, in this case, breaking up the clot, right? And it does seem that, in that respect, there maybe is substantial evidence in Dr. Valje's testimony because he talks about how the... is it the pro-lumen device? Yes. He talks about how the pro-lumen device, which is this S-shaped wire, does, when it's being rotated, operate as the basket or the cage. So, I mean, I think you're right, just looking at the... it's not an identical device, but under our law, looking at the way it operates, is there not substantial evidence? Well, I... See what I'm saying? I do, Judge Scholl. Unfortunately, I'm not familiar with those cases. I don't believe my adversary cited them. But my understanding is that structure and function are separate inquiries. The function, of course, is based on the language of the claim. The corresponding structure is based on the specification. We cited a case, I believe, in our reply brief to that effect, and that these are really separate analyses. Well, I think we... But the thing is, I think it is important, because in Edetics we said, the statutory equivalence analysis requires a determination whether the way the accused device performs the claim function, and the result of that performance is substantially different from the way the corresponding structure in the patent operates. So, I mean, it does seem that when you're looking at an accused device and you're trying to determine whether it has 112.6 equivalence, not DOE equivalence, you look at the way in which it operates. And it did seem to me that Dr. Valjeet did have some testimony on that, which a jury could accept. I hear what Your Honor is saying. And, again, I have to go back to the fact that we have to look at the claims, which are method claims, and in the case of the 191 patent, which is a typical claim, there are three method steps. The first method step is introducing a fragmentation catheter having a fragmentation member. Now, there is the 112.6 element. The introducing is a step of the claim, which they chose to make a step of the claim, and it's an important step. You're saying it has to be like a cage or a basket when it's introduced? Yes. Let me ask you, what do you see is involved in the deploying step? I mean, we have – there seem to be three phases in this operation. Yes. Is that the device when it's inside the sheath, we'll say? Then there's deployment. Then there's rotation, right? Right. What do you see is involved in deployment? The deployment, as I understand it in the specification, is the withdrawing of a sheath, which allows the basket to spring into position to conform to the size and shape of the lumen. That's the other limitation that's at issue, right? Yes. And that limitation, I guess, is in all three? All three patents. And are the parties – and we can find out, I guess, from a police counsel, but are the parties agreed to basically claim one of each as representative of the claims at issue in the respective patents? We've certainly taken that position. We believe they are. And in terms of validity issues, too. We believe all the dependent claims have basically trivial, well-known features. But I would like to move on, if I can. I see my time is dwindling. To the second limitation, which is expands to conform to the shape of the – before I leave it, though, I do want to mention the issue of prosecution history estoppel. It was never addressed by the district court. We did submit a motion on it at the close of evidence as required. You've got that in there, and I know you make that argument, but I could be wrong, but I'm not sure that's the strongest argument. That doesn't have anything to play, does it, with respect to the expands to conform limitation? No, it does not. It does not. But it would be helpful, as you raise these points, to point out the areas in which the presentation before the jury was inadequate, or if you're asking us to make fresh findings or consider matters that were presented or might have been or were not presented to the jury. Well, the issue of prosecution history estoppel, my colleagues at the other table contend that that should have been a jury issue. We should have sought an instruction on that. But you're saying that it was all right to – an appropriate procedure to give the jury the question of equivalency, and then when it's all over and they found equivalency to ask the court to say, however, it's not equivalent because there's estoppel? Well, we actually asked for it before the jury retired and after, as the Supreme Court has said we should. We followed exactly the procedure that's in the Supreme Court case. On prosecution history estoppel? On prosecution history estoppel, yes. It's in our briefs, Your Honor. I believe it's the Warner Jenkinson case, which specifically says legal limitations on infringement, such as prosecution history estoppel, should be brought to the court by a motion at the close of evidence and renewed in JMOL, and we did exactly that. And the district court never even acknowledged the issue when he eventually denied all of our post-trial motions. So what's the remedy? Well, the remedy on the issue of infringement – No, on the estoppel. Oh, on the estoppel. Well, we believe this court can – the estoppel is a legal issue, which, of course, this court is certainly capable of addressing. It's been fully briefed. The evidence is in the appendix, the evidence that we relied upon, and we believe the only substantive arguments, which the appellees have raised on estoppel, they didn't even raise those in the district court, so we believe there's a waiver on that. So you're saying the appropriate procedure for a trial such as this is to go through and have the full trial on equivalency as a matter of fact, and then, when it's all over, tell the court, well, you shouldn't have even tried it because there's estoppel. Your Honor, we actually moved for summary judgment early in the case. The district court denied it. In that motion, we invited the district court to construe the claims at that point. The district court opted not to do that and therefore basically said, well, the claims have not been construed, so I can't rule on this motion. And so the claim construction did not come until later in the case. But I am not suggesting that the case has to go through a jury trial. The district court could have granted our motion for summary judgment. He could have also, had he considered on the merits the motion we made before the jury retired, he could have rendered judgment in our favor at that time and dismissed the jury. But I think, as most practical or many practical judges believe is the right way to go, is in case it turns out they're wrong, in case this court decides they shouldn't have granted judgment at that point, they let the case go to the jury with the understanding that the issue can be renewed after trial. And, of course, here it was renewed. But the remedy now is to reverse the jury verdict. Yes, it is. Yes, it is. And we also believe the jury verdict should be reversed because there's a complete failure of proof on the issue of infringement. I see I only have 16 seconds left. We'll save you rebuttal time. Please respond to the question. Okay. I'm sorry, I thought I had, did I fail? You did. I did, okay. I just want to move on to the expanse to conform issue, if I may. Just a couple of minutes. Okay. The district court construed that limitation to mean that the fragmentation member expands and adjusts to remain in contact along the length and width of the inner lumen. And what that means is if, as a crude representation, if my fingers represent the five wires of a basket, it's expanding and it conforms to the walls of the inner lumen, and it has to remain in contact where my left fingers are, in the middle of my fingers, where my right fingers are. In this case, Dr. Valji admitted that there was only, the pro lumen only made contact at two points and only two points, which we would expect that because it's in the shape of a sine wave and it has a high point and a low point. And so it makes contact at the high point, it makes contact at the low point, and that's it. Are you saying that the, since the jury has decided this against you, that the evidence is insufficient to sustain the verdict on this issue? Absolutely. Yes, that is our position, Your Honor. But why couldn't the jury have thought they were equivalent? They did not argue doctrine of equivalence. They eschewed any reliance on doctrine of equivalence, both in the district court and in this court, on that limitation. It was not a means plus function limitation. It was a normal limitation. It was either. I wasn't asking about means plus function. I don't see a means plus function clause in there. No, it was not. Nobody ever suggested that was means plus function, but the plaintiffs did not assert infringement by doctrine of equivalence. They specifically said we're only asserting literal infringement. So the answer is. The expense to conform limitation. Yes, the expense to conform limitation. If I can take one more minute on the knowledge and intent issue. Again, these were method claims. There was no allegation that the defendant actually directly infringed by performing the process, which truthfully only a physician could perform. I'm sorry. Judge Shaw has a question, too. Oh, I'm sorry. Should I stop, Your Honor? Oh, no. Finish what you're saying. I just have one question. I just wanted to let Judge Newman know that I had one question I just wanted to ask. Oh, of course. It's sort of a housekeeping type question. Absolutely. Okay. Please complete your thought. I'm sorry. So the only contentions of infringement were inducement and contributory infringement. And as this court held in bank in the DSU case, inducement requires knowledge and intent that the steps are being performed by the user in a way which infringes the patent. We believe the plaintiff, which has the burden on that issue, offered no evidence. We as the defendant, without the burden, we submitted evidence in the form of opinions of two counsels. One was a written opinion by an attorney named Neil Gershon. Another was an opinion by Gary Moore, in-house counsel who reviewed the prior opinions, also reviewed the new claims when they came out and saw they had the same limitations and advised management that he believed there was no infringement. So given the absence of any evidence, any affirmative evidence of culpable intent, and given the substantial evidence of the opposite thereof, we believe the court should have granted JMOL on that issue as well. Just sort of a standard housekeeping question, Mr. Webber. On the infringement issue, okay, if we affirm the district court on both limitations, you lose on the infringement issue, and then you would fall back to your intent and your validity arguments, correct? The intent aspect of infringement and the validity, and there's an inequitable kind of issue as well, which I – Now, let me – and this, again, is sort of a standard question I always want to get squared away. Assume for the moment we were to rule in your favor on the infringement issue, is it your position that we would still have to get to the inequitable conduct and the validity issue? Because I think you had them in there as a counterclaim. So if we were to rule in your favor on the infringement issue, would you still want us to get to the inequitable conduct and the obviousness issue? I guess it's the official reference? Yes. The invalidity, I'm not – I haven't looked at the status of the law from the cardinal decision by the Supreme Court. Yes, I do believe that in theory your honors would be, you know, obliged to pursue it. But if we were exonerated from infringement, it wouldn't make a great deal of difference to my client if these claims were declared invalid. And if they were declared invalid, we would certainly have no need to pursue the inequitable conduct offense. Can I ask a question on – I'm sorry – on inducement and contribution? Did the trial judge instruct the jury on the requirement of intent? He did, your honor. Because it doesn't – it's not reflected in the jury questions. That's – well, that's probably correct. I haven't looked at them, but I believe you're right. That's probably right, but he did give an instruction. But there was no objection to the jury questions as put? No. And no objections to the charge? That's correct. That is correct, your honor. Thank you. Okay. Thank you, your honors. Thank you, Mr. Wepner. Would you enlarge Mr. George's time appropriately? Thank you, your honor. May it please the court. I'll go in the same order that Mr. Wepner did. Dr. Valji's initial report was – complied with all the rules. It was – it wasn't just check off the boxes. He did – he compared the device to the claims. He looked at the instructions for use. He talked about tests that he had done in Gelen. Can I go back for a moment? Yes. To the filing of the report? Tell me how the defendant was not prejudiced by having this report with its new theory given to them at 11 o'clock the night before the guy testified. Well, it wasn't a new theory. It was – in most, it was a new analogy. If you read the briefs, he talks about a quirk through theory. It's really just an analogy. We gave a full report before a claim construction. That talked about the S-curve and it touching on two places earlier? No, because that wasn't the claim construction yet. Yeah, but the claim construction occurred 16 days before the report. That's correct. And we filed a supplemental interrogatory response letting them know that we were going to present evidence based on the new claim construction. They didn't take any action with respect to that at all. So we told them we were going to do it, and then they had their motion in limine pending, which perhaps they thought they were going to win and get the whole report thrown out. And the judge denied their motion in limine, but the judge recognized that the thing – he had just two weeks before he had done – he had issued his claim construction ruling, and obviously the earlier report could not have reflected that. So he said, are you prepared to supplement the report? We said, yes, we are, and we did it that night. Now, the judge gave them time – he said, well, you can have more time to prepare your cross. And they didn't take it. And we're hearing today that they told the judge they wanted a rebuttal expert witness. They never asked for that. If you go to the transcript, they did not ask for a rebuttal expert witness. So I don't really understand. That's A367. So they never asked for it. Now they're asking for it? I mean, to me, it's really too late. So they had extra time to depose – they were on notice that we were going to do this, we were going to present evidence in accordance with the new claim construction that was all of two weeks old. We told them we were going to do it. The judge asked us to supplement, and we did. The judge offered to give them more time. They didn't take it, and they never asked for a rebuttal witness. Now I'd like to move to the infringement and to the questions raised by Judge Shaw. I think the cases you talk about and the applied case, which is cited in the brief, all say the same thing. You have a means plus function situation, and the function is breaking up the clots. And there's no contest that both of these devices perform the identical function. So then the test is, is there structural equivalency between the basket and cage and the S-wire? And the law is clear, as Your Honor mentioned, that you're supposed to look at the disclosed structure in the patent and the structure of the accused product when they're performing the function. And in fact, that's what applied says. And it says, once the relevant structure in the accused device has been identified, a party may prove it is the equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way with substantially the same result. So your frame of being, when you look at this, you're looking at the function. And the testimony of Dr. Valji was when... So what you're saying is that you hang your hat on the Valji testimony on the fragmentation limitation. I guess at 445 he says, when they're placed in a graph, when they're operated, the S-shaped wire takes on the configuration, essentially, of a basket. Exactly. And I think there's a couple of other... There is. That's right, Your Honor. Basically, he's saying when you're performing the function, the structure of these two devices are basically the same. So what you're saying is in rotation, the S-curve assumes the shape of a basket and it's in contact. Right, it's in contact with... As it's spinning around. Exactly. And as the tube is coming. So you don't look to things outside the function when it's being deployed. Now before that, though, before rotation, as Dr. Valji says, before rotation, the wire, the pro-lumen device, he acknowledges doesn't have that form. Well, before rotation, on this fragmentation member issue, before rotation, when it's in the sheath, the basket is pulled out so that it just looks like long wires, so it can fit in the sheath. And the S-wire is pulled out, so it's a long wire. So in a way, there's structural equivalence even there, because both of them are pulled out so that they can fit in. Well, no, but at that point, when it's just pulled out before you have the spinning, as he says, it's not in a basket configuration. That's correct. Because he says, obviously in this position, we're at 445, it is not a cage or a basket. Right. But the test is it has to be the equivalent of a cage or basket when it's performing the function. And that's what the applied case says. And the function is to break up the clock. Exactly. So you're saying at 445, and again, I think there's some other things, even though when the wire is out there, when it starts to spin, it does meet the equivalent structure. Exactly. It's equivalent structure. The function is clear. There's no discussion on that. Now, let's talk about prosecution history estoppel on this. They argue prosecution history estoppel on claim construction. The original claim construction that they wanted was the fragmentation member is a wire cage or basket, full stop. And they put in all the prosecution history that they've put in front of you and said, your honor, it should just be a wire cage or basket. They didn't get that claim construction. The court came back and said, no, it's a wire cage or basket or its equivalents, or their equivalents. So they argued this. They lost this. And what's interesting is they're not appealing the claim construction, which they lost. They didn't object to the jury charge. So under the cytologic decision that we cite in our case, it's over. The only question is, based on the charge that they never objected to, which was based on a claim construction, which they never objected to, was there substantial evidence? And there was. That's what we just talked about. Yeah, I mean, I think that you've explained, Mr. George, how the wire comes out. It's a wire, but then it becomes a fragmentation member when it's rotated and breaks up the clock. I have to say that I'm inclined to agree. And I hinted this to Mr. Whitman. I don't think prosecution history estoppel really comes into play that much. But let me ask you, on substantial evidence, turning to the – what's this other one? It automatically expands to conform. Where in the record do we have substantial evidence with respect to that limitation being met at deployment? Because it says – I mean, you have three stages here. You've got when it's in the sheath, you have deployment, and then you have rotation. And looking at claim one of the 191 patent, it says, automatically expands to conform to the shape and diameter of the inner lumen of the vascular conduit upon deployment. Now, certainly you've explained very clearly how it meets the fragmentation member limitation when it's being rotated. How do we expand to conform at deployment? The inner lumen device. Where's the substantial evidence in the record for that? That's the analogy of the corkscrew theory. And where do we have that? Where do we have that? I guess what you point to is at 436 to 437. 437. There's this discussion. He says at 436 lines – this is Dr. Valji again – 436 lines 9 to 12, you can see the distal end when we allow it to expand by deployment, it will expand both the shape and diameter of the inner lumen of the plastic tubing. Again, we have to remember it's got to be in contact three-dimensionally. And then we get into the corkscrew at 436, and then we have at 437, he talks about it's moving forward in one direction, and he goes into the corkscrew analogy. But that's always with respect to movement. At deployment, it comes out, we have this sort of static state, and then there is the testimony, I guess over at 463, where Dr. Valji says it only makes contact at two points. That's sort of the crux of it, and I think that's easily addressed. That was a hypothetical. And that became clear if we go to A478 in the transcript, where Dr. Valji is asked, and is it correct that if the wire was inside a lumen right now and was expanded to get up to the diameter of the lumen, the only contact would be at point 63 and 65, is that right? And the answer here, when Dr. Valji has a chance to explain, well, no, that's not entirely true. There could be contact at the tip. There could be contact along the shaft of it. Okay, let's answer because this is a curved device. Fair enough, Dr. Valji, to keep this simple. Let's suppose we're in a relatively straight segment of a graft. Would it then be fair to say that there is only really two points of contact or most? The answer, well, most segments of grafts are not straight. That wouldn't be representative of a graft. And this is completely consistent with the Datascope brochure and Datascope animation that the jury also had. He says at 477, he says, and when it's rotatated there are effectively infinite number of contacts with the clot. But I guess what I'm wondering about is if it's just sitting there at deployment, I don't see where you have the contact, where there's substantial evidence on that issue. Could I direct you, if I could, Your Honor, to A1240? A1240. A1240, which is the Datascope brochure. Okay. And this is what Dr. Valji was trying to explain. You have more than two points of contact. And what you have here, this is the ProLumen product. This is the Datascope product. And what you have here is the S wire is expanding and conforming to the size and shape of this tube. And really, in the real world, what's happening here is since the tube is curved, that S wire has to come out and it's got to follow the curve. In addition, since you're talking about a diameter that might be made smaller because of the thrombus, it also has to be able to get through that and then chop it up. What you can have is you can have the S wire come out, hit that first curve, and dead end and stop. Or hit that decreased diameter and dead end and stop. It has to expand and conform to the size and shape of this graph that it's in, which is not perfectly straight, which curves and goes up and down. And this shows it. The animation that the jury saw showed it. And they had the device. And Dr. Valje demonstrated it to them. And that showed it. But whether it shows it or not depends on the number of curves in the wire. You could increase the modicum. What you have here is not an S, but you have what is described in S wave. But this is the product. This is the accused product. This is what they're selling. This is their brochure for the accused product, Your Honor. I'm sorry. Oh, no, no, no. What I'm worried about is how does that show, though? Because the district court said, in elaborating on this, it says, conforming to the shape of the inner lumen means that the fragmentation member or the distal end conforms to the diameter across many horizontal cross sections at once, even though the individual cross sections may vary. And certainly, when you have the basket spinning around, you have that when the basket of the claim device opens up. But here, I guess I'm having difficulty seeing, Mr. George, how at deployment, because there has to be this contact at deployment, how at deployment it's meeting many horizontal points at once, as the basket does when it's deployed. There's no question that the patented device, when it goes out, it meets many horizontal points at once. But just at deployment, that's what the wire. The basket and deployment cage, in one embodiment, it's just four wires. So you're talking about four wires hitting, I guess, at four points. What you have in this picture is, in essence, those four wires pulled out, and you're still hitting at multiple points. Yeah, but it's not sort of multiple horizontal three-dimensional points. It's sitting there, and it goes like that. That doesn't seem to be what's contemplated by the claim. Well, the court construed the claim and read just the claim construction to the jury. That's what the jury had. Based on that claim construction and the animation and the facts, the animation, the device itself, they found infringement. The animation in the record? Yes, they put it in the record. Excuse me. If the device had one fewer curves or two fewer curves, so it was like this instead of whatever, if it were not an S but a C, would there be infringement? I don't know, Your Honor. I think that's what you're getting at. Well, what I'm probing is that I'm just having a little bit of a problem visualizing how there's this multiple three-dimensional contact that the claim construction and the claim require. The three-dimensional contact is you're looking at a diameter that's going to vary based on whether there's a thrombus there. The device has to be able to adapt to that varying diameter. In addition, you're looking at a tube. This is your X and Y axis. Those are two dimensions. In addition, you're looking at a tube that curves. It has to follow that as well. That's what's shown in the advertisement. No, I think you're correct on this, Judge, but I'm not sure that that meets. I think you've accurately described, if I can say, the geography of the lumen that's inside the person who's going to get the dialysis, but I'm not sure that I'm completely on board as to how what you describe, and I think you've accurately described it, meets the claim limitation. Let's look at what the court said. The court said that expands to conform to the shape and diameter of the inner lumen means that the fragmentation member expands and adjusts to remain in contact with the inner lumen in three dimensions along its length and width. That's what the jury had. If we look at the picture that I've shown you, it meets this test because it does expand to conform both to the diameter. Now, in that picture, the diameter doesn't change, but again, they had the animation that showed changing diameters, and it also shows the third dimension, the Y dimension. On the intent issue, we have, again, I hear that we have no evidence on intent, but this is in our brief already, but I'll point it out again. Oh, Mr. George, I'm sorry, one quick, and I don't want to cut you. This is before I finish. Yes. Do you agree with Mr. Wettner that claims, the first claim of each patent is representative? No. No, from a validity standpoint, absolutely not. Oh, no, I'm talking about infringement. From an infringement standpoint, I believe they all depend from the independent claims. Okay. Right, thank you. It's not claim one of the 551, it's claim 16, is the first independent claim. Okay. On the inducement issue, we have at A3735, we have admitted facts that they started selling the product in March of 2004. They were aware of the 191 patent, and they distributed the product with instructions for use. They intended that their customers will use the ProLumen in accordance with the instructions for use. So there's the intent. It's been used in the United States, and it's been used in accordance with its instructions for use. So we have the direct infringement. We have the first part of DSU that says you have to intend to cause the acts that result in infringement. They admitted that. And then the second part of DSU is known or should have known. And here we have clear evidence that they knew about the patent. They were worried about the patent. There was evidence of copying of the patent. Do you think there's any difference, Mr. George, when you have a situation? Now, I realize there's some dispute about whether the ProLumen device is an embodiment of their patent, right? But just as a hypo, leaving that issue aside, and I realize that's a fair point you make, but leaving that issue aside, do you think the intent situation changes a little bit when you have a case where someone who's an accused infringer is practicing their patent? I mean, if I get a patent, I think, oh, I've got my patent. I can go out. I mean, it doesn't mean they might escape infringement, obviously, but does it maybe change the calculus a little bit with respect to intent? No, because it could just be an improvement patent that incorporates the prior products. I don't really think that's it. And on this issue, there was no evidence by Mr. McGuckin that he never read the claim on the product. It never said. His patent on the product. Exactly. I'm sorry. Thank you, Your Honor. He never read the claim of his patent on his own product. He never did that. And, in fact, the question that Mr. Wepner asked him was about what was disclosed in the patent, and the answer was, yeah, the S-wire is disclosed in the patent. But the real question should have been, is it claimed? And then he should have gone through the claim. Now, Mr. Wepner chides us. He says, well, we never proved that the Arrow PTD device was covered by the patent. And we did, in fact, do that. Carl Baderbusch did that, and it is in the record at A338-341. We had him go through claim one of the 191 patent and apply every element to the Arrow product. So we did do that. They should have done that if they wanted to make this argument. They didn't do it. So there was no evidence. Are there any more questions for Mr. Wepner? I'm sorry. Any more questions? Can I ask one question about the inequitable conduct? Is that still in the case? It's still being – they still argued it on this appeal. Does not counsel have some obligation to find out what other lawyers in the law firm are doing? The judge in this case said that Alan Miller did not cultivate ignorance and did not have any knowledge of this. I understand that, but is that really the answer? Isn't there an obligation, even in very large law firms now, to find out what's going on? I mean, you have this with respect to conflict, so why not with respect to the opposite? Well, Your Honor, we never put on our case here because they didn't make their case as a matter of law. There were other attorneys working on this litigation, and if they had been able to prove their case, which they were not, we would have put on the rest of the story and we would have addressed your question. But we never got there. I didn't realize that. They failed to – they couldn't get past the first hurdle of intent. And part of the problem was is, you know, your question points to a situation where there's sort of a conspiracy, if you will, where people don't talk to each other. And if that's really what we had here – I wasn't assuming that. I'm simply asking whether there's an obligation, not whether there was a conspiracy not to talk to each other on purpose, but when you have people working in different sections of a law firm for the same client, is there some obligation to coordinate so that things like this don't happen? I would assume that there is some obligation, Your Honor, and what I was going to say is we never got to put on our evidence to show that point because he only charged Alan Miller with violation of the duty of candor. And on the record that he put in, the judge said, him alone, there's no intent, there's no duty to inquire. He didn't put his head in the stand. The claim was too narrow. Right. The legal claim was too narrow. Right. Okay. Okay. Any more questions? No, sir. Thank you, Your Honor. Any more questions? Okay. Thank you, Mr. George. Mr. Wepner? Thank you, Your Honor. I'd like, if I could, to just go backwards through the issues, starting with Judge Zobel's question about inequitable conduct. What happened here was that Judge Quarles held that Dr. Miller, the prosecuting attorney, did not have, first of all, did not have actual knowledge of the withheld materials. Dr. Miller so testified. Judge Quarles made that finding. We can't and don't appeal that finding. However, he then concluded as a matter of law that Dr. Miller was not under a duty to inquire whether such additional materials existed. And we believe that was a clear error of the law, because even if the initial interrogatory answers, which Miller had, had said nothing about the possibility of supplementing, he knew there was an ongoing litigation. He knew that the litigation was intimately related to the ----  intentionally didn't fulfill that duty in accordance with the materiality and intent provisions of inequitable conduct, because you're not saying whether or not the patent is invalid because of that reference is separate. Of course, Your Honor. It's separate. I'm sorry. Demean to interrupt. Okay. I don't want to divert you too much with the issue. I know that the law is viewed as in a state of flux, perhaps, for inequitable conduct. You're saying that it doesn't matter whether or not the intent to deceive was met if there was a should-have inquiry. Oh, no. We don't in any way suggest that we're reglieved of that burden on that issue. Judge Quarles never reached it, because he disposed of the issue on a judgment on partial findings after we submitted an expert report on validity, and we submitted an expert report on validity on the contention that Dr. Miller did not know about the withheld materials and had no duty to inquire. And as I started to say, we think he had a duty even if the materials he had said nothing about supplementation. But they did say something. They said, we have not yet had an opportunity to fully review the prior art. We may supplement when we do. And we did. We supplemented once. We supplemented a second time. We then submitted an expert report on validity, and none of those materials were submitted. You're talking about validity now. Well, I'm talking about a duty to inquire. Judge Quarles did not address materiality or intent in his decision. He only addressed knowledge. The entire basis for dismissing the inequitable conduct claim was that he had no actual knowledge and that he was under no duty of inquiry to see whether any materials existed. He did not reach the other issues. My adversaries have attempted to raise those as alternate grounds to affirm. We've put in our reply brief why we think they're wrong in those issues. We believe if indeed the court agrees with us on the issue of a duty to inquire, we believe the prudent case would probably be to send it back to the district court to decide those issues in the first instance, which the district court never did. Well, let me ask you, you heard my colloquy with, I guess, Mr. George on the infringement issue, and particularly the expands to conform limitation. Right. You know, putting, so to speak, my cards on the table, it does seem to me, and I can only speak for myself, that there's a pretty good case for substantial evidence on the fragmentation member point, given our jurisprudence and what we've said has to be established to me to show infringement by equivalent in a 112-6 situation, equivalent meaning little infringement in that setting. But I am a little bit concerned about the expands to conform limitation. And Mr. George responded, I think, mainly based upon the document at 1240 of the appendix that you were obviously looking at also. And the video or the, what was it? There was a video. There was a video showing the operation of the device. Yes. He hung his hat on those points. What is your response to his response to my questions, namely his focusing on 1240 and also on that video or that mock-up or whatever it was? Well, while he. Talk about deployment here. Yes. During his colloquy with Your Honor, I believe at some point he said that if there's a, or you may have said, Your Honor, that if there's a thrombus, it expands to get to where that thrombus is so that it expands to conform whatever shape the lumen is in. And I was drawing myself a little sketch, I don't know if Your Honors can see it, of a sinusoidal wire in a straight piece of a lumen. And the little X is a thrombus. And if it happens to be positioned midway between the two nodes, it's not going to ever be touched by the wire unless you move the wire within the lumen, which is a separate step in the 704 patent. It's not even in the other patents. It says withdrawing the device. So the, again. Because unless the thrombus is somehow including the lumen, if I'm using the right terms, you won't know that you need to go through this procedure. Well, that may be true. Isn't that right? I mean, I think your example doesn't seem to fit reality. Well, I think it does because when, remember, Your Honor, that when the device is inserted into the lumen, it's within a sheath. It's within a very narrow sheath. So it will be able to snake its way in. But then when you pull the sheath back, if the thrombus happens to be midway between the two points of contact or the three points, if it's a curve, the drawing that Mr. George pointed, Your Honors, to show just what Dr. Valji said, there could be three points of contact. This is the one at 1240. I believe so, yes. But, again, the claim construction, which, again, has not been contested, says expands and adjusts to remain in contact along the length and width of the device. If my nose is my pointer, it's at the left hand, it's at the middle, and it's at the right. It has to remain in contact along its width. Now, a basket clearly does that because a basket has multiple wires that do that. But when you have a single wire in the shape of a sinusoid, it's not going to happen. I want to make sure I understand. And I can only speak for myself, Mr. Weber. This is an important point for me. So I hope, if I can, ask your indulgence here. How do you respond? I mean, Mr. George says look at 1240. What is your response to his argument with respect to 1240, which I guess is the pro lumen brochure, right? Yes, it is. Let me just get it out again. He focused on that, and he also focused on this, I'll call it a video. I'm sure it was a very sophisticated computer rendering of some kind, but in any event, I'll just call it a video. If you could just tell me what your response is on those two points, this and the video. Okay. Well, the device shown on page 1240 shows the sinusoidal single wire making contact at somebody, I believe Dr. Valji marked an A at that one point of contact, a B at the other point of contact, and I believe there's some notation. He was probably showing that there was contact down near the tip.  Yeah, it could be a C. But again, it's at most three points of contact on a sharply curved piece of lumen. Now, while we agree and we don't contest that it's expanding to conform to the diameter, which the claim also requires, it is indeed doing that, it is not conforming to the shape, and it is not adjusting and making contact along the entire length of the S wire. It can't because of the sinusoidal shape. It's simply the midpoint between A and B can never make contact, and the midpoint between B and C can never make contact. Now, what about the, and again, we haven't seen it. I don't know. It might have been provided just to us. I'm not sure. What about the video to which he referred? Well, the video. Was that something Dr. Valji prepared? No, I believe what Dr. Valji did was some unidentified witness took a Datascope video showing how the prolumen works and then prepared a video using all the same colors and the same kind of narration to show how the ROPTD works. But again, it only really showed the device being withdrawn. It shows the device being inserted into the curved lumen. It shows the sheath being withdrawn. It shows the sinusoidal wire. And then when it spins, you have this optical illusion that it looks like it's Let me just ask you this, though. If the court wanted to view the video, it is part of the record on appeal. Well, it's part of the record. We have not submitted it. In our appendix, we just have a placeholder referring to it, but of course. Is there just one video? Is there more than one video? May I speak, Your Honor? Yes, please approach the desk so that the remarks are recorded. There's a little confusion here. The video that we're relying on, the animation that we're relying on, was prepared by Datascope. It was on Datascope's website. A Datascope witness said that it accurately shows how it works. Okay. That's what we're talking about. We're not talking about a different video. Let me ask you both. If we have an urge to view it for whatever reason, is this something where we should ask one or both of you to send us a disk? Either of us. We'd be happy to provide it. Can we go to the website? I took it off the website after we accused them of infringement. If you can collaborate and send us the video. We'll send it to the clerk. I think we would find it interesting. We submit all videos upon which either party relies. We have the pro lumen brochure here, but any and all videos that anybody relies on is only one. We'll confirm. Do your honors want multiple copies? I think one is enough. Multiple would be helpful. Okay. That's true because Judge LaBelle is at another location. We could certainly do that. Yes. All right. We'll send them to the clerk. Okay. We'll have them out within a couple of days. Now, we are well over time. Is there anything else you must tell us? I'll make one final point on the issue of invalidity. Mr. George took me to task for having made a statement on my reply brief that they did not prove, in terms of commercial success, that the claims cover the plaintiff's commercial device. What we said was they didn't show that all the asserted claims do that. They only put in testimony about one claim. There were 15 asserted claims. They did put in testimony as to one. One is enough, isn't it? Well, if you find that that's the broadest claim, if you find that that claim is non-obvious, then that is enough. If you find that it's non-obvious because of the commercial success, then that may be enough. But we believe that that broad claim is blatantly invalid under KSR. The evidence was very, very substantial and was never addressed substantively by the district court. He simply said the jury was free to disbelieve our evidence. We submit that they were not free to disbelieve the prior audit itself. They couldn't just make the prior audit go away. Thank you very much for all the time that you gave us, Your Honors. Thank you both. The case has taken over. Did you have any more questions?